**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Greenbelt Division**

ANGELA SINGLETON
136 Island View Drive
Annapolis, MD 21401

Plaintiff,

v.

MARYLAND TECHNOLOGY AND
DEVELOPMENT CORPORATION
7021 Columbia Gateway Drive, Suite 200
Columbia, MD 21046

Defendant

## COMPLAINT

Plaintiff Angela Singleton ("Plaintiff" or "Ms. Singleton"), by and through her undersigned counsel, as and for her Complaint in this action hereby alleges as follows:

## NATURE OF THE CLAIMS

1. This is a challenge to Defendant, Maryland Technology Development Corporation ("TEDCO"), for defamation and its unlawful employment practices against the Plaintiff, including its discriminatory treatment of Plaintiff due to her sex and race, and its unlawful retaliation against her after she reported the discriminatory treatment she faced in the workplace in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981("Section 1981") and the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't, § 20-601 *et seq*.

## JURISDICTION AND VENUE

2. All the allegations contained in the foregoing paragraphs of this Complaint are incorporated by reference herein as if the same were set forth at length.

3. The Court has subject matter jurisdiction over this action pursuant to U.S.C. § 1331 as this

action involves federal questions regarding the deprivation of Plaintiff's rights under Section 1981.

4. Pursuant to 42 U.S.C. § 1981, this Court has subject matter jurisdiction over this civil action because this action is being brought within the four-year statute of limitations period set forth in Section 1981.

5. The Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367 because Defendant's violations of MFEPA arise under the same case or controversy as the Court's subject matter jurisdiction.

6. Pursuant to MD. Code Ann., Cts. &Jud. Proc 6-102, the Court has personal jurisdiction over defendant because it is an instrumentality of the state of Maryland and organized under the laws of the state of Maryland.

7. The Court has subject matter jurisdiction over this defamation action because this action is being brought within a year of the Plaintiff's discovery of the publication, per the discovery rule under Maryland law.

8. Venue is proper pursuant to 28 U.S.C. 1391 because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

9. Plaintiff Angela Singleton is a resident of Annapolis, Maryland. At all relevant times, Plaintiff is and has been a resident of Maryland and met the definition of an "employee" under all applicable statutes.

10. Defendant TEDCO is an instrumentality of the state of Maryland that provides Maryland early-stage technology and life sciences companies with funding, resources and connections. At all relevant times, TEDCO has met the definition of an "employer" under all applicable statutes.

## FACTUAL ALLEGATIONS

11. Plaintiff is an African American, female entrepreneur and investor.

12. Plaintiff was employed by TEDCO from August 2012 to June 2020.

13. From August 2012 to August 2016, Plaintiff worked mentoring Maryland entrepreneurs in the field.

14. In August 2016, Plaintiff began working from TEDCO's Columbia, Maryland headquarters.

Shortly thereafter, Plaintiff joined TEDCO's Seed Investment Fund ("SIF) Deal Team, where Plaintiff's daily work was directly supervised and controlled by TEDCO, and she was treated as an employee with reduced hours.

15. Plaintiff was employed as the Director of TEDCO's Builder Fund at the time TEDCO terminated Plaintiff's employment.

16. From the outset, Plaintiff was subjected to a pattern of race and sex-based discrimination, and witnessed the discriminatory treatment of colleagues, and applicants for TEDCO funding based on their race and sex.

**Plaintiff Was Subjected to, and Witnessed, Discrimination at TEDCO.**

17. Shortly after beginning work at TEDCO's headquarters, Plaintiff began to experience and witness significant race and sex-based discrimination, including against African American women who applied for TEDCO funding.

18. For example, only 10 out of 135 investments TEDCO made in 2017 and 2018 were to companies run by African American entrepreneurs – a mere 7.4% of investments, in a state that is 31.1% African American. While these African American run companies represented 7.4% of investment volume, they represented only 0.85% of investment amount, totaling only $270,000 of the $31,684,395.51 invested by TEDCO during this period. On average, these 10 African American run companies only received $27,000 each in investment from TEDCO compared to the more than $250,000 doled out to other companies, on average, by TEDCO.

19. During this same period, TEDCO's then CEO stated to Plaintiff that investments in African American-owned businesses were higher risk.

20. The discrimination Plaintiff faced increased substantially in 2017, when she and her team were transferred to work within the Maryland Venture Fund ("MVF"), a subdivision of TEDCO.

21. The MVF was a very discriminatory and hostile environment for both women and African Americans. As a result, the only African American male on the original SIF team opted out of continued involvement in SIF under MVF leadership.

22. Plaintiff stayed and was subjected to mistreatment by her male MVF colleagues shunned and excluded her from important meetings and networking events, often refused to speak to her, refused to come to meetings about her deals they were charged by their managing director to attend, and Plaintiff was insulted and screamed at when she offered comments during meetings.

23. Plaintiff's male colleagues did not treat each other in this manner. However, Plaintiff's male

colleagues treated the only other female member of the team, Dr. Arti Santhanam (who was also a woman of color) just as poorly as Plaintiff.

24. For example, on more than one occasion, Plaintiff's male colleagues "replied all" to proposals submitted by Plaintiff and Dr. Santhanam with harsh, personal criticism but never behaved similarly toward other male colleagues.

25. Also, Dr. Santhanam, who had worked with members of the MVF longer than Plaintiff, confided in Plaintiff that before Plaintiff joined the team and she was the only woman, she thought members of the MVF just didn't like her, but seeing Plaintiff subjected to the exact same treatment, Dr. Santhanam understood that they were being treated poorly because they were women.

26. On at least four occasions, Plaintiff requested and was repeatedly denied an essential tool that her MVF colleagues were using and relied upon to perform their jobs. On September 30, 2017, Plaintiff requested to learn MVF's market research databases and their go to resources for fact checking in general from Moss Amer. Mr. Amer's response was "There aren't any specific resources we have access to, but Google can be a pretty powerful" which was somewhat condescending and patronizing. Plaintiff found out about Pitchbook, an analytics database and research tool indispensable to those in the industry and contacted the company to learn more. Pitchbook informed Plaintiff that TEDCO already had a subscription and advised Plaintiff that TEDCO had an open seat on the license, which Plaintiff only needed to ask for.

27. Plaintiff went back to the MVF Managing Director and requested access. Plaintiff was then directed to Parag Sheth, another team member. Plaintiff requested access from Mr. Sheth on three occasions; two in writing which were ignored, and the third in person where Mr. Sheth committed to granting Plaintiff access but never did. Plaintiff was only granted access to Pitchbook on August 23, 2019, more than18 months after her initial request. Plaintiff's access to Pitchbook was granted only after Ms. Thomas, the African American female head of marketing assumed managerial oversight over these types of access requests.

28. In 2018, the only company founded by an African American (male) who Ms. Singleton did manage to secure $100,000 in SIF funding for was derided and mocked by Plaintiff's MVF colleagues in a scornful manner and labelled an inferior, less qualified company.

29. In January 2018, Plaintiff complained to TEDCO's President and COO, John Wasilisin about the discrimination. In response, Mr. Wasilisin reported it to the CEO who took no disciplinary action against any member of the MVF team.

30. Instead, Mr. Wasilisin transferred Plaintiff and Dr. Santhanam- who had also complained of discrimination, out of the MVF.

31. Plaintiff was placed in a new position in which she continued to be subjected to race- and sex-based discrimination.

32. In Plaintiff's new position, she came up with the idea for, and coined the name for TEDCO's new "Builder Fund," and was instrumental in securing funding for it.

33. TEDCO resisted making Plaintiff director of the Builder Fund, instead naming her "co-program manager" of the Fund along with a less-qualified male.

34. The Builder Fund, which focused on assisting minority entrepreneurs, was marginalized at TEDCO.

35. For example, only weeks after Plaintiff and other colleagues presented before the Maryland General Assembly to secure funding for the Builder Fund program, they were notified by TEDCO that the funds would be moved to the jurisdiction of a white male investment director in charge of another fund.

36. Both Plaintiff and her co-program manager (an African American male) of the Builder Fund, were treated worse than the non-African American leaders of other TEDCO programs.

37. For example, Plaintiff and her co-program manager were excluded from TEDCO leadership meetings, while more junior white employees were invited.

38. Additionally, Plaintiff and her co-program manager were initially relegated to cubicles, while their white peers generally were given offices. Office space was only allocated to Plaintiff and her co-manager following Plaintiff's repeated requests.

**Plaintiff and Three Other Female Employees Complain About Discrimination at TEDCO**.

39. In 2019, TEDCO's Board of Directors commissioned a "workplace cultural study" conducted by an outside law firm.

40. Plaintiff met with the investigator on two occasions between February and May 2019 to discuss her experiences of discrimination at TEDCO.

41. Three other women all raised similar concerns about sex and race discrimination at TEDCO to the investigators.

42. In early 2019, Plaintiff, along with these other three women was invited to share her concerns about discrimination at TEDCO with the new chairwoman of TEDCO's board of directors.

43. The workplace cultural study turned out to be a sham – in particular, it was later revealed that

members of the MVF were coached on what to tell the investigators – and in May 2019, TEDCO stated that it revealed no evidence of discrimination and the findings supported hiring a Human Resource ("HR") specialist.

44. In July 2019, Plaintiff met with TEDCO's incoming HR representative, Li Na Goins, and again disclosed her experiences with discrimination at TEDCO. The response from Ms. Goins was that Plaintiff's male colleagues were not going to change, and that perhaps Plaintiff should look for another job. No investigation was conducted, and no further action was taken. Ms. Goins further suggested to Plaintiff that she employ a tactic observed in "My Big Fat Greek Wedding" and make her male colleagues think her ideas and suggestions were their own.

45. In November 2019, during a management-wide training organized by human resources, multiple employees, Plaintiff included, raised further concerns about discrimination. Notably, several employees spoke up about TEDCO's discriminatory treatment of African American women in general and of Plaintiff in particular.

46. In 2019, after Plaintiff lodged multiple complaints, her relationship with her direct supervisor, Stephen Auvil, who was also serving as TEDCO's interim executive director, began to deteriorate. Upon information and belief, Mr. Auvil was made aware of Plaintiff's prior complaints.

47. Plaintiff also complained to Mr. Auvil about her less-qualified, male co-program manager not performing his assigned duties, leaving her with significant additional work.

48. Plaintiff complained to Mr. Auvil that she was performing the job duties of a director but was unfairly and incorrectly classified and paid only as a co-program manager.

49. Ultimately, TEDCO made Plaintiff Director of the Builder Fund, consistent with the duties she was already performing, however, Mr. Auvil resisted changing her title, and took steps to frustrate, stall and undermine her reclassification at every step.

50. For example, after asking Plaintiff to draft her own job description, Mr. Auvil removed key areas of her responsibility, including the ability to hire staff. He also attempted to impose a six-month probationary period on Plaintiff's eligibility for pension benefits, notwithstanding the fact that she had worked with TEDCO for seven years at that point. Plaintiff ultimately resolved most of these concerns by engaging human resources.

51. Plaintiff alleges that Mr. Auvil's treatment of her during this time period was both discriminatory and retaliatory.

52. After Plaintiff was reclassified as director of the Builder Fund, Mr. Auvil interfered with

Plaintiff's ability to hire an additional staff person for the Builder Fund. He said that the Builder Fund's budget would not support additional staff, even though other programs with similar or lower budgets had at least two full-time staff members. These other programs were run by whites and/or men and/or individuals who had not engaged in protected activity, and these other programs did not focus on assisting minority entrepreneurs.

53. During discussions about the Builder Fund position, Mr. Auvil used coded language to criticize Plaintiff based on her race and sex. For example, during a November 5, 2019 conversation about the position, Mr. Auvil told Plaintiff that she had an "aggressive" communication style that made her difficult to work with.

54. Plaintiff found out later that same day, that Mr. Auvil had informed TEDCO's only other African American female manager, who was among the four women who complained about discrimination, that her communication style was "aggressive."

55. Mr. Auvil also immediately opposed Plaintiff's request for a bonus around the same time.

56. Two TEDCO employees- Tammi Thomas and Jennifer Hammaker, recommended to TEDCO's Board and Executive Team, in the fall of 2019, that Plaintiff receive a bonus because she was s responsible for TEDCO's only new funding in the Governor's proposed 2020 budget, and because she had gone above and beyond on her work on the Task Force for Women Entrepreneurs.

57. All staff in FY 2019 received a 100% bonus, and the exclusion of Plaintiff, despite others lobbying for her bonus, was both discriminatory and retaliatory.

**Defendant's Pretextual Termination of Ms. Singleton**

58. In December 2019, TEDCO hired Linda Singh as the interim executive director.

59. Shortly thereafter, Plaintiff disclosed the discrimination she had experienced at TEDCO and her unaddressed complaints to Ms. Singh.

60. Soon thereafter, TEDCO began retaliating against Plaintiff and the other women who had previously complained of discrimination during the workplace cultural study.

61. In March 2020, Ms. Singh fired one of the women who complained about discrimination at TEDCO without explanation or cause.

62. On March 30, 2020, Ms. Singh transferred Plaintiff's supervision to interim managing director Elizabeth Good Mazhari, who immediately started retaliating against Plaintiff and setting her up for termination by making deliberate attempts to sabotage Plaintiff's performance effectiveness

and follow through.

63. On or about May 12, 2020, Ms. Mazhari made sudden and drastic changes to the Builder Fund investment closing process without consulting Plaintiff.

64. The changes included transferring pending Builder Fund investment closings back to the Office of Attorney General ("OAG") for processing, which drastically slowed the closing process. Previously, by direction of and with training provided by the OAG, the Builder Fund completed all of its own investment closings with minimal OAG assistance.

65. To further delay Builder Fund investment closings, Ms. Mazhari gave MVF default notifications priority over Builder Fund investment closings.

66. Ms. Mazhari never provided Plaintiff with any rationale for the changes. Transferring this function back to the OAG and then prioritizing MVF default notifications would have resulted in the stalling of payments to fledgling companies with no other source of funding, thereby resulting in unfavorable criticism of Plaintiff from these companies.

67. Plaintiff's follow-up inquiry with her peers revealed that the process changes made by Ms. Mazhari were not TEDCO-wide changes. The other small funding programs not under Ms. Mazhari's supervision continued to complete their investment closings independently and expeditiously.

68. Ms. Mazhari delayed the closing of Plaintiff's program's deals, and at the same time tried to solicit negative feedback about Plaintiff from the companies that would be impacted by the delays.

69. Before the publication of TEDCO's new regulation in January 2020, Plaintiff secured an appropriate benchmark for a proposed modification based on her recommendation to TEDCO's executive board. Plaintiff offered to present it to the audit committee and board, however, Ms. Mazhari preempted her and assumed responsibility for getting it to the audit committee and on the board's agenda.

70. Ms. Mazhari then sat on the initiative, and when Plaintiff sought to confirm that the topic was on the Board's agenda during her one-on-one with Ms. Mazhari on May 19, Ms. Mazhari casually stated she forgot to move it up the chain and sent an email to the team confessing she "dropped the ball".

71. Ms. Mazhari also began communicating with Plaintiff's one direct report, Tim Wilson (a white male), who was still within his 90-day probationary period at TEDCO, behind Plaintiff's back and undermining her authority.

72. Ms. Mazhari reassigned Mr. Wilson to only work part-time for Plaintiff, and later criticized Plaintiff for supposedly working him too hard.

73. Plaintiff was only informed by Ms. Mazhari that Mr. Wilson would be splitting his time between the Builder Fund and MVP on May 19, 2020.

**TEDCO's defamation of Plaintiff**

74. On May 20, 2020, Mr. Wilson failed to attend the Builder Fund Roundtable Kickoff meeting. This was a significant event which was the premier event for all of the companies admitted into the program. Mr. Wilson had, however, participated in and contributed to preparations made for this event.

75. When Plaintiff inquired why Mr. Wilson did not attend, he falsely accused Plaintiff of not informing him that he was invited, stating, "this event was planned, discussed, and executed without any involvement or even informational updates being provided to me." When the multiple ways in which he had been both informed and invited were pointed out, Mr. Wilson then falsely blamed the executive organizer for using a wrong email address for him in her invitation. However, the email invitation from the executive organizer showed that Mr. Wilson was invited to the kickoff meeting via the correct email address.

76. In an attempt to control the narrative, Mr. Wilson forwarded an incomplete email chain to Ms. Mazhari, omitting the executive organizer's email invitation to him and falsely asserting that Plaintiff had been "MIA all day" at the roundtable. However, Plaintiff was in attendance while Mr. Wilson was not.

77. Ms. Mazhari never notified Plaintiff of Mr. Wilson's correspondence for her input on the matter as Mr. Wilson's supervisor, and the tone of Mr. Wilson's email suggests that he previously met and communicated with Ms. Mazhari about Plaintiff without the knowledge of Plaintiff.

78. Mr. Wilson appears to have continually gone above Plaintiff to voice his concerns directly to Ms. Mazhari. Mr. Wilson's interaction with Plaintiff's supervisor was well outside of normal office protocol and his concerns and complaints were not taken up with Plaintiff contemporaneously.

79. Circumstantial evidence suggests that Mr. Wilson's misrepresentations triggered the call for action against Plaintiff by her superiors- Ms. Mazhari forwarded Mr. Wilson's email to Ms. Singh and Ms. Goins and flagged it for follow up.

80. This email exchange and Mr. Wilson's discontent as shared by him exclusively is the sole

consideration that led the three women to conclude on May 21, 2020 that Plaintiff would be notified that her contract was in jeopardy of full renewal. There was no communication with Plaintiff about the accusations made against her before or after this critical decision was made.

81. Ms. Mazhari did not encourage Mr. Wilson to share his frustrations with Ms. Singleton as a first step. Ms. Mazhari only directed Mr. Wilson to Ms. Goins but did not provide Plaintiff with that same option.

82. Ms. Goins asked Mr. Wilson to draft a detailed "memo" listing his experiences working for Plaintiff. Mr. Wilson obliged and sought to understand if the memo met her needs in the cover letter of the memo. Presumably, it was meant to be his honest feedback, but his inquiry implies he was working against a specified standard and need.

83. In his memo, Mr. Wilson made numerous defamatory statements against Plaintiff. For example, he made sweeping statements, that Plaintiff's "paranoia and toxicity" led her to tell him "about a large number of employees, and why they are incompetent, and why they cannot be trusted, and why I need to watch everything I say to them, and watch out because they are likely plotting against me". This is false. Plaintiff never made any statement to the effect that various employees at TEDCO were incompetent and not to be trusted.

84. Mr. Wilson then mischaracterized Plaintiff's inquiry about his pursuit of an interaction with Frank Glover, who had hitherto been unresponsive and indifferent to Mr. Wilson's attempts as an example of Plaintiff's "paranoia and toxicity".

85. Mr. Wilson also falsely asserted that working with Mr. Glover was in his contract, however, working with Mr. Glover was not included in the delineated duties of his contract. Mr. Wilson also stated that Ms. Mazhari had previously spoken with him about working with Mr. Glover. However, Plaintiff was not made aware of any such conversation, and if the conversation actually occurred, Plaintiff was kept in the dark about it.

86. Mr. Wilson then asserted that Plaintiff's work style was unproductive and kept him in the dark, stating, "I have never even been given a list of the executives or met with them via email or anything. I have no idea who they are, or what their interactions with BF are like." Working with the executives was not part of Mr. Wilson's duties or work plan, and his statements are defamatory and false. Plaintiff had indeed introduced Mr. Wilson to at least three of the executives, as at the time of the writing, and Mr. Wilson had just skipped the business roundtable kickoff event run by one. Plaintiff even invited Mr. Wilson to participate in the executive interview process and he did.

87. But for Mr. Wilson's selective forwarding of an incomplete email exchange to Ms. Mazhari and Mr. Wilson's subsequent memo to Ms. Goins, it is highly unlikely that TEDCO would have had enough reason to justify a nonrenewal of Plaintiff's contract.

88. On May 26, 2020, Ms. Singh informed Plaintiff that her employment contract would be extended for 90 days, but not be renewed, thereby essentially firing Plaintiff.

89. Ms. Singh alleged this was due to Plaintiff's performance, though Ms. Singh and Ms. Mazhari did not identify specifics except that Plaintiff was, paradoxically, both working Mr. Wilson too hard and not giving him sufficient responsibility to interact with Builder Fund executives, which was beyond the scope of his duties, but included in Plaintiff's job description.

90. The same day, TEDCO informed another one of the women who complained of discrimination that it was not renewing her contract, thereby essentially firing her.

91. On June 3, 2020, Ms. Mazhari approved Plaintiff's request for leave, stating that she had checked with both Mr. Wilson and the OAG and both felt they had the pending investment closings covered.

92. Yet Ms. Mazhari characterized things very differently in a subsequent email communication with Ms. Goins and Ms. Singh the following day, literally stating that "it doesn't sound like she [Plaintiff] communicated her plans to anyone…"

93. Ms. Mazhari's statements were so reckless and misleading that Ms. Goins restated for emphasis in an email to both Ms. Mazhari and Ms. Singh that "her [Plaintiff's] request was not approved" and initiated dialogue on whether to designate the leave as unpaid.

94. Ms. Mazhari's misrepresentation of Plaintiff as a rogue employee who acted with reckless indifference as to her duties was defamatory and placed Plaintiff in a false light before Ms. Goins and Ms. Singh when Ms. Mazhari had full knowledge that she approved Plaintiff's leave.

95. By the time Ms. Mazhari corrected and clarified the record, the damage had already been done, and an unfavorable impression of Plaintiff was reinforced.

96. Ms. Mazhari continued in this pattern of misrepresenting facts and casting Plaintiff in a false light. That same day, Ms. Mazhari brought to Ms. Goins' and Ms. Singh's attention yet another "saga" that Plaintiff's Builder Fund milestones were missing. Ms. Mazhari suggested that Plaintiff lied about having completed the milestones which were represented as completed in her status report.

97. Without first checking with Plaintiff to understand the milestone whereabouts, Ms. Mazhari

raised these concerns to Ms. Goins and Ms. Singh, suggesting that Plaintiff's conduct was worthy of her termination.

98. Ms. Singh instantly characterized Plaintiff's behavior as a power play. After Ms. Mazhari suggested giving Ms. Singleton 24 hours to supply the milestones, Ms. Singh responded, "I would say that if she does not respond and/or produce, we need to determine do we bring her back. I think this is a tactic and it would be my guess she is like let's see how they do without me." This was yet another instance of Ms. Mazhari portraying Plaintiff in a false light, resulting in the continued fueling of Ms. Singh's negative impressions.

99. Plaintiff had already completed the milestones and presented them to Ms. Mazhari without delay in about an hour upon first request from Ms. Mazhari by email.

100. The only reason Plaintiff held onto the milestones in the first place is because, in her vacation approval notification, Ms. Mazhari held Plaintiff responsible for any issues that might occur while she was away. Plaintiff, therefore, made it a point to stay in the loop to ensure the process went smoothly, advising Mr. Wilson that she would remain part of the routing process and submit the milestones when prompted.

101. Mr. Wilson went on to misrepresent Ms. Singleton's continued participation as engaging in unnecessary gatekeeping to Ms. Mazhari, which Ms. Mazhari in turn characterized as unacceptable.

102. Plaintiff's timely response while on approved leave and her willingness to remain available during vacation are indicative of her strong work ethic and not a poor one as claimed by Defendant.

103. The damage to Plaintiff's reputation, however, was already done. The defamatory statements by Mr. Wilson and Ms. Mazhari were served up to Ms. Singh before anyone bothered to reach out to Plaintiff.

104. On June 15, 2020, Ms. Mazhari put Plaintiff on a 90-day performance development plan ("PDP") which was vague, subjective, and primarily focused on the "unhappiness" and work-life balance of Mr. Wilson.

105. The PDP set up for Plaintiff was not in good faith and misrepresented numerous facts, including: 1) Plaintiff's knowledge prior to May 19, 2020 that Mr. Wilson's time would be split, 2) that Plaintiff left work unfinished prior to taking approved vacation, 3) that Plaintiff excluded Mr. Wilson when, in fact, he made choices as to his involvement and 4) the scope of Mr. Wilson's duties and work plan.

106. Then, four days into the PDP, TEDCO fired Plaintiff without explanation or justification.

**COUNT I: RACIAL DISCRIMINATION IN VIOLATION OF SECTION 1981**

107. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

108. Defendant has discriminated against Plaintiff by subjecting her to disparate treatment because of her race, by *inter alia*, excluding her from leadership meetings while more junior, white employees were invited and denying her office space while most of her white peers were generally given office space.

109. Defendant made racially motivated and racially coded statements against Plaintiff such as calling Plaintiff's communication style "aggressive."

110. All staff in FY 2019 received a 100% bonus, and the exclusion of Plaintiff even with others lobbying for her was discriminatory.

111. Defendant discriminated against Plaintiff by resisting her reclassification as Director of the Builder Fund to align her responsibilities with her title by undermining her, frustrating her, and stalling the reclassification at every turn.

112. Defendant interfered with Plaintiff's efforts to hire an additional staff member, claiming the budget did not support a new hire, even though other projects run by white, and or male employees, with similar or lower budgets had at least two full time staff.

113. Defendant refused to grant Plaintiff access to Pitchbook, an essential and indispensable tool her MVF colleagues had access to, despite Plaintiff's multiple requests for access.

114. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered harm.

115. Defendant's unlawful discriminatory conduct constitutes a willful and wanton violation of Section 1981, was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights.

**COUNT II: RETALIATION IN VIOLATION OF SECTION 1981**

116. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

117. Plaintiff's complaints to Mr. Wasilisin, Ms. Goins and a member of Defendant's board of

directors was protected activity under Section 1981.

118. All staff in FY 2019 received a 100% bonus, and the exclusion of Plaintiff, despite others lobbying for her was discriminatory and retaliatory.

119. Defendant discriminated and retaliated against Plaintiff by resisting her reclassification as Director of the Builder Fund to align her responsibilities with her title by undermining her, frustrating her and stalling the reclassification at every turn.

120. Defendant interfered with Plaintiff's efforts to hire an additional staff member, claiming that the Builder Fund's budget would not support additional staff, even though other programs with similar or lower budgets had at least two full-time staff members. These other programs were run by white and/or men and/or individuals who had not engaged in protected activity, and these other programs did not focus on assisting minority entrepreneurs.

121. Defendant delayed the closing of Plaintiff's program's deals, and at the same time tried to solicit negative feedback about Plaintiff from the companies that would be impacted by the delays, all in a deliberate attempt to sabotage Plaintiff's performance effectiveness and follow through.

122. Defendant also began communicating with Plaintiff's one direct report behind Plaintiff's back and undermining her authority.

123. Plaintiff's one direct report was assigned to only work part-time for Plaintiff, and Defendant later criticized Plaintiff for supposedly working him (a white male) too hard.

124. After Plaintiff's protected activity, she was targeted by Defendant, and terminated without explanation or justification.

125. Defendant's stated reason for Plaintiff's termination is pretext.

126. Plaintiff was terminated because of her protected disclosures about the discrimination she was subjected to by Defendant.

**COUNT III: SEX AND RACE BASED DISCRIMINATION IN VIOLATION OF MFEPA**

127. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

128. Ms. Singleton is an African American, female and former employee of Defendant.

129. Plaintiff's male MVF colleagues shunned and excluded her from important meetings and networking events, often refused to speak to her, refused to come to meetings about her deals they were charged by their managing director to attend, and Plaintiff was insulted and screamed at when

she offered comments during meetings. Plaintiff's male colleagues did not treat each in this manner.

130. Defendant made racially motivated and racially coded statements against Plaintiff such as calling Plaintiff's communication style "aggressive."

131. Defendant refused to grant Plaintiff access to Pitchbook, an essential and indispensable tool her MVF colleagues had access to, despite Plaintiff's multiple requests for access.

132. Defendant excluded Plaintiff from receiving a bonus for FY 2019, although Plaintiff was responsible for securing Defendant's only funding in the Governor's proposed 2020 budget, she had gone above and beyond on her work on the Task Force for Women Entrepreneurs and two other employees had lobbied for Plaintiff to receive a bonus.

133. All staff in FY 2019 received a 100% bonus, and the exclusion of Ms. Singleton, despite others lobbying for her was discriminatory.

134. Defendant resisted Plaintiff's reclassification as Director of the Builder Fund to align her responsibilities with her title by undermining her, frustrating her and stalling the reclassification at every turn.

135. Defendant interfered with Plaintiff's efforts to hire an additional staff member, claiming the budget did not support a new hire, even though other projects run by white, and or male employees, with similar or lower budgets had at least two full time staff.

136. As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer financial and economic damages.

137. Defendant's unlawful discriminatory conduct constitutes a willful and wanton violation of MFEPA, was outrageous and malicious, was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's civil rights.

**COUNT IV: RETALIATION IN VIOLATION OF MFEPA**

138. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

139. Plaintiff's complaints to Mr. Wasilisin, Ms. Goins and a member of Defendant's board of directors was protected activity.

140. Defendant excluded Plaintiff from receiving a bonus for FY 2019, although Plaintiff was responsible for securing Defendant's only funding in the Governor's proposed 2020 budget, she

gone above and beyond on her work on the Task Force for Women Entrepreneurs and two other employees had lobbied for Plaintiff to receive a bonus.

141. All staff in FY 2019 received a 100% bonus, and the exclusion of Ms. Singleton, despite others lobbying for her was discriminatory and retaliatory.

142. Defendant resisted Plaintiff's reclassification as Director of the Builder Fund to align her responsibilities with her title by undermining her, frustrating her and stalling the reclassification at every turn.

143. Defendant interfered with Plaintiff's efforts to hire an additional staff member, claiming that the Builder Fund's budget would not support additional staff, even though other programs with similar or lower budgets had at least two full-time staff members. These other programs were run by whites and/or men and/or individuals who had not engaged in protected activity, and these other programs did not focus on assisting minority entrepreneurs.

144. Defendant delayed the closing of Plaintiff's program's deals, and at the same time tried to solicit negative feedback about Plaintiff from the companies that would be impacted by the delays.

145. Defendant also began communicating with Plaintiff's one direct report behind Plaintiff's back and undermining her authority.

146. Plaintiff's one direct report was assigned to only work part-time for Plaintiff, and Defendant later criticized Plaintiff for supposedly working him (a white male) too hard.

147. After Plaintiff's protected activity, she was targeted by Defendant, and terminated without explanation or justification.

148. Defendant's stated reason for Plaintiff's termination is pretext.

149. Plaintiff was targeted at work and terminated because of her protected disclosures about the discrimination she was subjected to by Defendant.

**COUNT V: DEFAMATION IN VIOLATION OF MARYLAND LAW**

150. Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

151. Defendant forwarded an incomplete email chain to Plaintiff's supervisor, falsely asserting that Plaintiff had been "MIA all day" at the roundtable kickoff meeting. However, Defendant was fully aware that Plaintiff was in attendance.

152. Defendant asserted that Plaintiff's "paranoia and toxicity" was displayed via Plaintiff's

statements indicating her low regard for her co-workers and her mistrust of them. This is false. Plaintiff never made any statement that Defendant's employees were incompetent and not to be trusted.

153. Defendant falsely portrayed Plaintiff's inquiry about Mr. Wilson's pursuit of an interaction with Mr. Glover, who had hitherto been unresponsive and indifferent to Mr. Wilson's attempts as an example of Plaintiff's "paranoia and toxicity".

154. Defendant falsely asserted that working with Mr. Glover was in Mr. Wilson's contract, however, working with Mr. Glover was not included in the delineated duties of his contract.

155. Defendant stated that Ms. Mazhari had previously spoken with Mr. Wilson about working with Mr. Glover. However, Plaintiff was not made aware of any such conversation, and if the conversation actually occurred, Plaintiff was kept in the dark about it.

156. Defendant falsely asserted that Plaintiff's work style was unproductive and kept Mr. Wilson in the dark because he stated, "I have never even been given a list of the executives or met with them via email or anything. I have no idea who they are, or what their interactions with BF are like." Working with the executives was not part of Mr. Wilson's duties or work plan, and Defendant's statements are defamatory and false. Plaintiff had indeed introduced Mr. Wilson to at least three of the executives, as at the time of the writing, and Mr. Wilson had just skipped the business roundtable kickoff event run by one. Plaintiff even invited Mr. Wilson to participate in the executive interview process, and he did.

157. Defendant made the above-described defamatory statements with actual knowledge of their falsity, via email to Ms. Mahzari and Ms. Goins.

158. Defendant also made the above-described defamatory statements with reckless disregard for the truth by not ascertaining the truth regarding Mr. Wilson's statements against Plaintiff and, not directing Plaintiff to Ms. Goins as Mr. Wilson was.

159. But for Defendant's selective forwarding of an incomplete email exchange to Ms. Mazhari and the subsequent memo to Ms. Goins, it is highly unlikely that Defendant would have had enough reason to justify a nonrenewal of Plaintiff's contract on May 26, 2020. Thus, harming Plaintiff and essentially firing her.

160. Defendant's email communication with Ms. Goins and Ms. Singh on June 4, 2020, stating "it doesn't sound like she [Plaintiff] communicated her plans to anyone…" when discussing Plaintiff's approved leave on June 3, 2020, was an outright falsehood.

161. On June 3, 2020, Defendant approved Plaintiff's request for leave, stating that both Mr. Wilson and the OAG had been contacted, and they felt they had the pending investment closings covered.

162. Defendant's statements were so reckless and misleading that Ms. Goins restated for emphasis in an email to both Ms. Mazhari and Ms. Singh that "her [Plaintiff's] request was not approved" and initiated dialogue on whether to designate the leave as unpaid.

163. Defendant's misrepresentation of Plaintiff as a rogue employee who acted with reckless indifference as to her duties was defamatory and placed Plaintiff in a false light before Ms. Goins and Ms. Singh when Defendant had full knowledge that Plaintiff's leave had been approved.

164. By the time Defendant corrected and clarified the record, the damage had already been done, and an unfavorable impression of Plaintiff was reinforced.

165. Defendant engaged in a continued pattern of misrepresenting facts and casting Plaintiff in a false light.

166. Defendant suggested to Ms. Goins and Ms. Singh that Plaintiff lied about completing the Builder Fund milestones which were represented as completed in Plaintiff's status report.

167. Defendant raised these concerns to Ms. Goins and Ms. Singh, suggesting that Plaintiff's conduct was worthy of her termination, without first inquiring about the milestones from Plaintiff.

168. Plaintiff had already completed the milestones and presented them to Defendant without delay in about an hour upon first request by email.

169. Defendant made these above-mentioned defamatory statements with actual malice and a reckless disregard for the truth.

170. Defendant made these false statements without privilege or justification.

171. Defendant's misrepresentations of Plaintiff led Ms. Singh to instantly characterize Plaintiff's behavior as a power play.

172. These false portrayals of Plaintiff resulted in the continued fueling of Ms. Singh's negative impressions of Plaintiff.

173. Defendant presented Plaintiff's participation in Builder Fund operations while on vacation as engaging in unnecessary gatekeeping and characterized it as unacceptable.

174. This was a gross misrepresentation of Plaintiff since in Defendant's vacation approval notification, Plaintiff was informed that she would be held responsible for any issues that might occur while she was away.

175. Plaintiff's timely response while on approved leave and her willingness to remain available during vacation are indicative of her strong work ethic and not a poor one as claimed by Defendant.

176. At this point, however, the damage to Plaintiff's reputation, was already done. The defamatory statements made by Defendant were served up to TEDCO leadership before anyone bothered to reach out to Plaintiff, and harm to Plaintiff ensued.

177. On June 15, 2020, Defendant put Plaintiff on a 90-day performance development plan ("PDP") which was vague, subjective, and primarily focused on the "unhappiness" and work-life balance of Mr. Wilson.

178. The PDP set up for Plaintiff was not in good faith and misrepresented numerous facts, including: 1) Plaintiff's knowledge prior to May 19, 2020 that Mr. Wilson's time would be split, 2) that Plaintiff left work unfinished prior to taking approved vacation, 3) that Plaintiff excluded Mr. Wilson when, in fact, he made choices as to his involvement and 4) the scope of Mr. Wilson's duties and work plan.

179. As a result of the publication of these false and defamatory statements made by Defendant, Plaintiff's contract was not renewed, she was placed on the PDP and terminated four days later without explanation or justification.

180. Plaintiff did not discover and had no reason to discover the defamatory statements until April 26, 2021. Plaintiff filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC") and the defamatory statements were discovered when Plaintiff received Defendant's Position Statement.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that the Court grant the following relief:

A. Determine the damages sustained by Plaintiff as a result of defendant's willful and intentional violations of 42 U.S.C. § 1981 and MFEPA, and award back pay and compensatory damages against Defendant in favor of Plaintiff.

B. Award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/ or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment.

C. An award of damages in an amount to be determined at trial, plus prejudgment interest, to

compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her severe mental anguish and emotional distress, humiliation, embarrassment, stress and injury to personal dignity.

D. An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees and other associated costs to the fullest extent permitted by law.

E. An award of punitive damages to Plaintiff for Defendant's willful and intentional discriminatory and retaliatory treatment of Plaintiff.

F. Grant Plaintiff such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all questions of fact raised by this complaint.

Dated: April 22, 2022

Respectfully submitted,

/s/ Denise M. Cark

Denise M. Clark, Esq. (17385)
Clark Law Group, PLLC
1100 Connecticut Ave., N.W., Suite 920
Washington, D.C. 20036
Telephone: (202) 655-2239
Facsimile: (202)293-0015
dmclark@benefitcounsel.com